**Francine NEWMAN, Plaintiff,**

**v.**

**The BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF NEW YORK, Defendant.**

**No. 73 C 473.**

United States District Court,
E. D. New York.

Dec. 15, 1977.

Joan E. Goldberg, New York City, for plaintiff.

Norman Redlich, Corp. Counsel, New York City by H. Kenneth Wolfe, Asst. Corp. Counsel, New York City, for defendant.

## DECISION AND ORDER

PLATT, District Judge.

The plaintiff is a tenured, licensed teacher in the New York City School System who on July 31, 1970 was found medically unfit for teaching duty by the defendant and placed on an involuntary unpaid leave of absence from and after September 11, 1970.

On April 5, 1973, plaintiff brought this action "for a declaratory judgment and appropriate equitable relief" under 42 U.S.C. § 1983 and 28 U.S.C. § 1343 and the Fourteenth Amendment and 28 U.S.C. § 1331.

The plaintiff claims the defendant has violated her rights to procedural due process by not providing her with an adversary proceeding before finding her unfit to teach and seeks annulment of that finding, reinstatement, restoration of her accumulated sick leave and back pay.

On February 15, 1974, Judge Travia of this Court granted summary judgment for the defendant on the ground that an earlier State Court determination was *res judicata.*

The Court of Appeals reversed and remanded, *Newman v. Board of Education of the City School District of New York,* 508 F.2d 277 (2d Cir.), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1447, 43 L.Ed.2d 762 (1975), ordering "further proceedings in light of this opinion" and relying on its prior opinion in *Lombard v. Board of Education,* 502 F.2d 631 (2d Cir.), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975). The remand was for consideration of plaintiff's due process claim.

On remand the defendant renewed its motion for summary judgment on the ground that the Board of Education was not a "person" under 42 U.S.C. § 1983 and that a suit under 28 U.S.C. § 1331 was not permitted here. The plaintiff cross moved

for summary judgment. In an opinion dated February 19, 1976, the late Judge Judd denied the defendant's motion on the ground that since both issues were before the Court of Appeals in a number of cases and pending decisions in that Court, the plaintiff's complaint should not be dismissed. Judge Judd reserved decision on the plaintiff's cross motion pending further submission of papers.

On March 8, 1976, the Court of Appeals issued its opinion in *Monell v. Department of Social Services of the City of New York*, 532 F.2d 259 (2d Cir. 1976), *cert. granted* 429 U.S. 1071, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977).

Thereafter the defendant renewed its motion for summary judgment and both parties have submitted further papers on the plaintiff's cross-motion for summary judgment.

The facts which are not in dispute are as follows:

The plaintiff commenced her services in the New York City public school system in September 1945 as a substitute teacher of health education.

The plaintiff received her license as a teacher of health education in the day high schools in September of 1952. She also holds a substitute license to teach health education in day high schools and a license to teach in adult community centers and summer playgrounds under the sponsorship of the New York City Board of Education. In June, 1955 the defendant granted the plaintiff tenure in her position as a regular teacher of health education in senior high schools.

For each of the years during which the plaintiff taught, from 1945 through 1969,

she received a "satisfactory" rating. For the academic year 1969–70, the plaintiff's services were rated "unsatisfactory."

The plaintiff received well over 28 commendations with regard to her teaching abilities during her teaching career.

At the time the plaintiff's services were suspended in 1970 by the defendant, her annual salary was $15,150.

From the time of the plaintiff's being suspended, her annual salary, based upon annual increments, would have been as follows:

| | |
|---|---|
| Sept. 1, 1970 to Oct. 1, 1970 ($15,150 ÷ 12) | $ 1,262.50 |
| Oct. 1, 1970 to Oct. 1, 1971 | 16,000.00 |
| Oct. 1, 1971 to Oct. 1, 1972 | 16,950.00 |
| Oct. 1, 1972 to Sept. 1, 1973 | 16,591.63 |
| Sept. 1, 1973 to Sept. 1, 1974 | 19,250.00 |
| Sept. 1, 1974 to Sept. 1, 1975 | 20,350.00 |
| Sept. 1, 1975 to Jan. 1, 1976 | 6,783.33 |
| Total Salary Sept. 1, 1970 through Dec. 31, 1975 | $97,187.45 |

At the time of the plaintiff's suspension, she had accumulated 200 days of "sick leave," which accumulated on the basis of 10 days per year.

At the time the plaintiff's employment was suspended, she was employed at and assigned to Far Rockaway High School at Beach Twenty-fifth Street and Ocean Crest Boulevard in Far Rockaway, New York as a teacher of physical education.

By letter dated January 26, 1970, Mr. Gordon sent a letter to Dr. Nathan Brown, then Superintendent of Schools, requesting that the plaintiff be examined by the Medical Division of the Board of Education in order to determine her mental capacity to perform her duties.

Mr. Gordon annexed to and submitted with his letter of January 26, 1970 a memorandum setting for his reasons for the requested examination.[1]

---

1. The full text of Mr. Gordon's memorandum reads as follows:

The following are the reasons for my request for a physical and medical examination of Miss Francine Newman.

It is my opinion that Miss Francine Newman, a teacher of Health Education at this school requires medical help and at least temporary relief from her duties. She is embittered, hostile, and alienated from most of her colleagues. Her judgments in professional areas are unusual and inapproriate. Her handling of pupils has resulted in an inordinate number of complaints and nasty pupil reactions. I cite specific illustrations.

In the handling of her classes, she is unreasonable and arbitrary in some of her demands, but cannot be persuaded of her error through reasoned discussion. Several times

she charged students with having forged medical notes without first investigating, berated them violently, and referred them for disciplinary action. The medical notes proved to be authentic. Upon being apprised of this her response was "Well, it looked like a child's handwriting." On one occasion, she gave a "U" in citizenship to approximately 75 students in a class of 90, and defended her action by saying "I warned them I would do so if they misbehaved." When the principal and Mr. Rommer, then her chairman, held a conference with her to discuss the mass "U" incident, she angrily stormed out of the office saying, "Give me a U".

Except for minimum communication required professionally, she speaks with no one in her department, and coldly and strongly rejects any friendly overtures. At the time of her mother's death, recently, she publicly characterized as "hypocritical" the faculty members who sent condolence cards. When she learned that members of her department had sent a contribution in her mother's name to the Cancer Society, she telephoned their headquarters and demanded that the money be returned to the donors, saying that she would replace the sum with a personal contribution.

She assigns assisting teachers in physical education classes to duties easily handled by a student aide and screams at them and at the pupils when they incur her displeasure. Mr. Rommer, at a meeting with her and others, tried to tell her that this was why her assistants were hesitant to approach her. In rapid succession she rejected his statement, then admitted to the screaming, and finally condoned it by saying "she gets over it soon".

She rejects every suggestion by her supervisor that her actions are other than perfect. Recently, she dismissed a class without allowing adequate time for dressing. As the girls hurried from the locker room to avoid lateness to the next class, one child fell and was hurt. Miss Newman's chairman spoke to her and suggested that as a matter of safety she allow the full seven minutes for dressing. She replied, "No one told me about the accident, and children fall on the stairs all the time anyhow." The next day, she again dismissed this class late. On another occasion, when the chairman tried to engage her in quiet conversation for privacy, she moved away ten feet or more, saying that there was nothing Mrs. Ashepa had to say to her that couldn't be overheard by students.

When reports of complaints to the principal from various staff members (deans, chairmen, etc.) accumulated, a meeting was held with Miss Newman and eight or nine other members of the faculty in an effort to help her and to extend an offer of support and a plea for friendliness. She rejected them all and let the group know that her handling of school situations was right and that of the others wrong. She then filed a grievance against the principal charging harassment, even though her presence at the meeting was voluntary, and the whole thing arranged with her approval and that of her adviser, Mr. Arneson (UFT chapter chairman). At this grievance (Step 2) she demanded to know specific names of complaining students. Everytime I referred to an incident, she picked it up in detail, described it in detail, and acted as though her behavior in each instance were completely justified and sound. For example, she told one girl in her class that the girl was sick, and the girl replied "Look who's talking." Again, during conferences on Open School Night, she mimicked a foreign-speaking parent.

When the principal sends her a note, no matter how innocuous or politely worded, she becomes irate and challenging—even though the note may merely request information. The accompanying note (Exhibit A) was sent to her. She asked for a meeting with the principal and the assistant chapter chairman (Mr. Gerowitz) to respond to it. She stated that she would not meet with the principal without having someone with her.

Recently Miss Newman was demonstrating exercises to her physical education class. This required separating the legs. Her panty hose were split along a seam, and she was not wearing underpants. The class and her assistants were in a stir. Instead of turning the class over to an assistant, she continued to demonstrate. When the next day, her supervisor suggested that she wear underpants, she flew into a rage and called her a "lousy bitch". She then went to a male teacher nearby, picked up her dress, and showed him that she was wearing underpants. She repeated this performance the next day with Mr. Arneson, chapter chairman. A full period discussion was held among her, the chapter chairman, Mr. Rommer (formerly her chairman), and the principal. It became evident to me that she could not be reasoned with, and a note was sent to her (Exhibit B). She filed a grievance. In connection with this, the following events occurred. She scotch-taped the statement appearing in Exhibit C on to a table in the teachers' lounge. She brought the torn pantyhose to the Step 2 hearing, and asked the assistant superintendent to note the position of the hole. She distributed mimeographed sheets (Exhibit D) in the teachers' cafeteria. She brought the panty hose to the teachers' cafeteria to show her colleagues.

Mr. Gordon's request for the plaintiff's examination by the Medical Division of the Board of Education was made pursuant to Section 2568 of the New York Education Law.

One of the purposes of the medical examination was to ascertain if a psychiatric examination was required.

Plaintiff could have been examined by doctors or psychiatrists of her own choice and submitted reports by them to the Board of Education under Section 2568 of the New York Education Law.

By notice dated February 3, 1970, the plaintiff was directed to appear on February 11, 1970 for examination. The notice was sent over the signature of Sidney Libowitz, M.D., the Medical Director of the Medical Division of the Board of Education.

The plaintiff was first examined at the Medical Division by Dr. Barbara Wright on February 13, 1970 at approximately 2:20 p.m. Dr. Wright is a medical doctor and not a psychiatrist.

Dr. Wright's physical examination of the plaintiff resulted in a finding of normal as to all organs and functions examined.

Prior to Dr. Wright's examination of the plaintiff, she read Mr. Gordon's letter and report dated January 26, 1970.

Dr. Wright discussed the contents of the principal's letter and report with the plaintiff and stated that the plaintiff's response was:

"No. 1, she claims she was justified in making 75 youngsters a U rating because they were late for many reasons. She denies she said 'Give me a U,' to the principal. So she denied that she had said that. Second, regarding the panty hose incident, she states the whole incident took two minutes and she tossed off the split in her panties, saying something like 'Look what happens when you gain an extra pound.' Three, she put enclosed notices on bulletin board in Teachers' Room, saying that all could view the progress of her case because she wished to to publicize her story to others. That's what she said to me, as I understood it. In explaining the role playing incident that she gave as a class assignment, she states she did it as a 'safety check,' i. e., she gave them accidents to play out, an accident that could happen in gym class, such as having split garments or splitting ones panty hose or feeling nauseous when they acted this out. Then she would discuss with the class how to handle these problems. In other words, she used this as a teaching mechanism. I am ad-libbing now. This lesson came under 'Safety checks.' She denies then—another point she denies is that she denied talking to her colleagues, which was one of the complaints that was in the principal's let-

Subsequent to the Step 2 decision, she designated students for role-playing in one physical education class. One girl was to pretend to have cramps; another to be wearing pantyhose with a hole near the crotch. She interrogated the girls in the class where the original incident occurred, one line each day, as to their reactions to the incident. In the process, she dismissed them late.

Miss Newman is insistent upon the following of regulations by her fellow teachers and by students. When it is pointed out to her that she is inconsistent in regard to her own behavior, she explains this away with complete self-justification.

Miss Newman over-reacts to situations and appears unable to exercise self-control and reasoned judgment. Efforts at two-way discussions are unavailing; her response to written notes of record is to file grievances charging harassment and persecution. Generally speaking, she is rigid, hostile, and suspicious. She balloons molehills into mountains. Incidents which would be glossed over by most teachers are built into a cause by Miss Newman.

/s/ David Gordon
DAVID GORDON
PRINCIPAL

January 26, 1970

ter, and then, shall I go on, those were the charges."

Dr. Wright did not make any notation nor does she have any independent recollection of how long the examination took.

At the conclusion of the examination, Dr. Wright referred the plaintiff to a second doctor for examination. Dr. Wright's reason for this referral was:

"The reason I did so is because it is customary in cases when there have been reports sent in by the principal's office to have the teacher seen by a second doctor when we feel that she should be referred for a panel psychiatric examination."

Dr. Wright noted on her report:

"Throughout the interview the teacher was pleasant, she smiled almost constantly. She seemed almost a bit overproductive to me and perhaps, at times, stayed away from exactly answering a question exactly. She was not hostile. She denies psychiatric history of any type. Because I find it very difficult to evaluate this teacher I would suggest that she be seen by a panel psychiatrist for further examination."

On February 13, 1970 the plaintiff was examined by Dr. Wallfield at the Medical Division of the Board of Education.

Dr. Wallfield has not yet been deposed by the plaintiff but it has been established that he is a medical doctor, not a psychiatrist.

Dr. Wallfield and Dr. Wright both recommended that the plaintiff be seen by a psychiatrist who was a member of the Board of Education's panel of consultants for psychiatric evaluation.

The plaintiff was then directed by the Medical Division of the Board of Education to an examination by Dr. Morris Isenberg, a psychiatrist, on February 25, 1970, and Dr. Samuel Prensky, a psychologist, on April 13, 1970.

By report dated March 2, 1970,[2] Dr. Isenberg's conclusion was as follows:

---

**2.** The full text of Dr. Isenberg's psychiatric findings reads as follows:
>   Psychiatric Findings Contained in the Report of Dr. Morris Isenberg, dated March 2, 1970.
>
>   Behavior: Miss Newman stated she was very active in the Bnai Brith and involved in union activities. She spent a lot of time with nieces and nephews. She also paints, cooks and has her own apt. She travels and is at present writing a book. Sleep: Good. Appetite: Ravenous. Smoking: None. Drinking: Occasional. Drugs: None.
>
>   Emotions: She felt she has matured and her sense of humor has developed. When her mother was sick, she would cry on her way home.
>
>   No ideas of reference were elicited. She felt this was an unpleasant situation.
>
>   Orientation, Calculation & General Knowledge: Good.
>
>   Insight: The teacher said there was nothing wrong with her but there was a lot awfully right with her. She believed there was a lot of "hep" with her and asked to excuse the conceit.
>
>   Miss Francine Newman has been able to function in the school system for 25 years and it has been only in the past year that she has been having difficulties. This may indicate a change of personality. Although she is 46, there are no disturbances of the menses and so the menopause cannot well be implicated. The mother's severe illness of 10 months, that the teacher called nightmarish, and finally her death on Oct. 10, 1969, could be looked upon as a precipitating cause of an emotional upset. It appears to me that Miss Newman is suffering from a mild state of hypomania. She has shown poor judgment in giving "U"s to such a large part of her class, in picking up her dress to show her underpants, and ignoring complaints. She was not aware that these actions of hers could possibly lead to criticism. She has been also excessively irritable. When she felt insulted by a superior, she called the other a "lousy bitch" and explained it away by saying she was quite angry, ignoring that it was very insulting and may lead to further action. She has also shown expansiveness in her announcement on the bulletin board and her writing of a book.

"Before I make a final diagnosis, I request a neurological examination and a Rorschach test.

"Although I stated it was a mild state of hypomania, it is severe enough to interfere with her functioning as a teacher."

Hypomania is defined in the American Heritage Dictionary of the English Language, Houghton Mifflin Co., N.Y., 1973, as "a mild state of mania involving slightly abnormal elation and activity."

Dr. Isenberg requested a neurological examination and Rorschach test of the plaintiff before making a final diagnosis of the plaintiff.

No neurological examination of the plaintiff was ever conducted.

The plaintiff was directed to and did submit to Rorschach testing by Samuel J. Prensky, Ph.D. On April 13, 1970. Dr. Prensky's conclusion and recommendations [3] were as follows:

3. The full text of Dr. Prensky's report reads as follows:

SAMUEL J. PRENSKY, PH.D.
510 EAST 86TH STREET
NEW YORK, NEW YORK 10028

212 088–4555

RESIDENCE OFFICE:
2500 JOHNSON AVENUE
RIVERDALE, NEW YORK 10463    PSYCHOLOGICAL REPORT
212 884–8718

FRANCINE NEWMAN                Born:      October 23, 1923
108–48 70th Road                Age:       46–5
Forest Hills, New York          Examined: April 13, 1970
File Number 144709

Referral

    Miss Newman was referred by the School Medical Director of the Board of Education of The City of New York for a psychological evaluation. She holds a license as a Teacher of Health Education in Day High Schools and was seen as part of the medical examination procedure.

Test Administered

Rorschach

Appearance and Test Behavior

    She appeared at the scheduled time accompanied by Mr. Charles Loiacono, field representative of the United Federation of Teachers. He sat quietly noting the proceedings and did not interfere in any way. Miss Newman was appropriately and somewhat colorfully dressed. She volunteered that she has a master's degree in health and physical education from Columbia University. In addition, she stated that she has had courses at the New School including twelve credits in behavioral studies. Although she is a garrulous woman she made every effort to please. She appeared to be fairly well controlled and attempted to impress the examiner favorably. As the session was terminating she mentioned casually that she had asked her father, a physician, to accompany her to the examination but he had declined to do so.

Test Results

    The Rorschach record is one of an excitable neurotic woman who is making strong efforts to control herself and whose impulses are waning. She is basically an outgoing person who has a wealth of ideation and emotional experience. At one time she was even more affected by the environment. Despite oppositional and negativistic tendencies she has a drive to achieve, high intelligence, and the ability to organize while remaining aware of everyday problems. She can be practical. Her control is poor at times and she can become

"In my opinion Miss Newman does not have the qualities of personality that are necessary for good and stable interpersonal relationships with pupils, co-workers, supervisors, and parents of pupils at this time. I feel she will not be able to give continuous and effective service to the school system without some help. Her current emotional distress appears to be subsiding and she exercises fair control. With help she is likely to regain her composure and make an adequate adjustment. I feel she should be given a strong suggestion with regard to obtaining understanding and insight through professional help."

Dr. Isenberg's diagnosis of the plaintiff in his report dated June 20, 1970[4] is as follows:

"My diagnosis of Miss Francine Newman's mental status is Passive-aggressive Personality, aggressive type, severe, precipitated by death of her mother and manifested by many instances of impulsive behavior, difficulties with pupils, co-workers, and superiors, excessive irritability, lack of judgment, and no insight. In my opinion, Miss Newman is not fit to perform the duties of a teacher."

By report dated July 7, 1970 of the Medical Division of the Board of Education, the plaintiff was found "Not fit at present for teaching duty" and placed on "Leave of Absence for purpose of health improvement till June 30, 1971."

The text of the Medical Division Report, dated July 7, 1970, in substantiation of the foregoing findings, is as follows:

"In accordance with a request from the Superintendent of Schools of January 28, 1970, this teacher was called for examination in the Medical Division to evaluate bizarre behavior reported by her Principal.

"She was seen on February 13, 1970 by two physicians who, in the course of examining her, found her thought processes to be overproductive and her judgment poor. She was seen in psychiatric consultation on February 25, 1970. She was hypomanic. Psychometric testing was

excited, unstable, and impulsive. She can be unrealistic and arbitrary as she was when she gave a confabulated response. Also, a "spoiled" response pointed up her inadequate control. She appeared inappropriate in a formal testing situation. She is spontaneous and imaginative, has active ideation, and is interested in people, however, her primitive instinctual drives and immaturity are often apparent. Generally, she has the ability to match her drives. Despite the presence of some appropriate affective behavior, she can distort reality at times, is capable of rage reactions, and shows uninhibited, chaotic, emotional responses in an explosive and impulsive manner. She appears to be a hypersensitive, easily-offended person with relatively little tact who may be depressed at times. Her anatomical preoccupation is related to her professional interests but her food responses suggest some affect hunger and need for substitutive gratification. While she is capable of conforming with usual standards and possesses creativity, she can be careless and appear bizarre at times.

Conclusions and Recommendations

In my opinion Miss Newman does not have the qualities of personality that are necessary for good and stable interpersonal relationships with pupils, co-workers, supervisors, and parents of pupils at this time. I feel she will not be able to give continuous and effective service to the school system without some help. Her current emotional distress appears to be subsiding and she exercises fair control. With help she is likely to regain her composure and make an adequate adjustment. I feel she should be given a strong suggestion with regard to obtaining understanding and insight through professional help.

/s/ Samuel J. Prensky, Ph.D.
SAMUEL J. PRENSKY
Psychologist

4. See note 4 on page 1002.

done on April 13, 1970. Her record showed an excitable, neurotic woman. Her control is poor, she is explosive and impulsive.

"Her psychoneurosis and passive aggressive personality characterized also by poor judgment and no insight, are deemed to impair her ability to perform her duties."

The plaintiff, despite repeated requests, did not receive copies of any of Dr. Wright's, Dr. Wallfield's, Dr. Isenberg's or Dr. Prensky's reports until after the commencement of the instant action in the federal courts in 1973. She did receive a copy of the Board of Education report set forth in the immediately preceding paragraph.

The plaintiff received the Board of Education report placing her on medical leave and dated July 7, 1970, on July 31, 1970.

On the same day, the plaintiff was told that she was required to use up her 200 days of cumulative absence reserve, or "sick days."

**4.** The full text of Dr. Isenberg's June 20, 1970 report reads as follows:

MORRIS ISENBERG, M. D., F.A.P.A.
106–24 JEWEL AVENUE,
FOREST HILLS, N. Y. 11375

BOULEVARD 1–0043

June 20, 1970

MEDICAL DIVISION
Office Personnel
Board of Education of the City of New York
65 Court Street
Brooklyn, N. Y.

Re:  Francine Newman
108–48 70th Road
Forest Hills, N. Y.

FINAL CONCLUSION: This conclusion is to be read in connection with my report of March 2, 1970. In the meantime, there was a psychological report made on Miss Francine Newman.

As stated in my previous report, Miss Newman was able to perform well in the school system for 25 years but began to exhibit difficulties of a severe degree in her functioning in the past year. She showed poor judgment repeatedly, for example, when, among other instances, she picked up her dress to a male teacher to show her underpants and when she called a superior a "lousy bitch". What made these occurrences even more damaging was her lack of insight into these experiences and thus makes a repetition of similar situations possible. Miss Newman gave indications of excessive expansiveness in her bulletin announcements and possibly in her plan to write a book. In relation to the above, it is worthwhile to include the results of the Rorschach examination, which reveals an excitable neurotic woman with negativistic tendencies and inadequate control, capable of impulsive and uninhibited emotional responses.

Although a mild hypomania is. to be considered in the differential diagnosis, I shall give, because of a doubt, a milder diagnosis in terms of a neurosis, which would be sufficient to disqualify the teacher as a teacher.

My diagnosis of Miss Francine Newman's mental status is Passive-aggressive Personality, aggressive type, severe, precipitated by death of her mother and manifested by many instances of impulsive behavior, difficulties with pupils, co-workers, and superiors, excessive irritibility, lack of judgment, and no insight. In my opinion, Miss Newman is not fit to perform the duties of a teacher.

/s/ Morris Isenberg
MORRIS ISENBERG, M.D.

By notice dated September 4, 1970, the plaintiff requested a review of the Medical Director's recommendation by an *ad hoc* committee of physicians as authorized by the contract then existing between the Board of Education and the United Federation of Teachers, of which union the plaintiff was then a member.

By letter dated October 27, 1970, Theodore H. Lang, then Deputy Superintendent of the Board of Education, denied the plaintiff's request on the grounds that since she was being compensated for the first 200 days of her medical leave because she had sufficient accumulated "sick day" reserve, she was not eligible for consideration at such a hearing.
stating:

Although the plaintiff's involuntary leave of absence for health reasons terminated on June 30, 1971, she was not allowed to resume her work.

On September 15, 1971 the plaintiff was again directed to submit to examination by Board of Education doctors for their determination of her fitness to return to duty.

The plaintiff was examined by two physicians employed by the Board of Education Medical Division on October 18, 1971. The first physician was Robert Lazarus, M.D., a medical doctor and not a psychiatrist, who concluded after examining the plaintiff:

"On the basis of the current interview I can find no reason to find her other than fit to return. However, on the basis of her past performance, as well as the judgment of our panel psychiatrist and psychologist, I believe a psychiatric re-evaluation is indicated."

His recommendation was "Judgment suspended, panel psychiatrist."

The second physician to examine Miss Newman on October 18, 1971 was Dr. Gregory Cinque, a medical doctor, not a psychia-

trist. Dr. Cinque stated at his examination before trial conducted on November 19, 1973,

"At the time I examined her she was mentally able to return to work, but her previous behavior was not such that I could say that without supportive help."

Dr. Cinque's conclusion following his examination of the plaintiff on October 18, 1971, was,

"As far as I can judge she is fit for duty but supportive panel psychiatrist is warranted for final decision."

By notice dated November 11, 1971, the plaintiff was directed to report to Dr. Jack Schnee, a psychiatrist on the Board of Education panel of consultants. Dr. Schnee concurred [5] with Dr. Isenberg's diagnosis,

"I concur with Dr. Isenberg's diagnosis and his recommendation that Miss Newman's mental status is Passive aggressive Personality, aggressive type, severe and is not fit to perform the duties of a teacher. I would hope that she can enter a psycho-therapeutic relationship with the aims of improving her functioning rather than to prove to the therapist that she is a well person, capable of superior functioning."

The plaintiff was found not fit to return to duty and her health leave was extended to June 30, 1972 by notice dated December 22, 1971.

Each of the above doctors, with the exception of Dr. Schnee who had two interviews with the plaintiff, saw the plaintiff on only one occasion.

The plaintiff consulted two psychiatrists for independent evaluation of her condition.

The first psychiatrist consulted by the plaintiff was Dr. Albert Valicenti, who saw the plaintiff in psychiatric consultation once a week for seven weeks from September 8, 1970 through October 16, 1970, and referred

**5.** See note 5 on page 1004.

**5.** The full-text of Dr. Schnee's report dated December 2, 1971 reads as follows:

JACK SCHNEE, M. D., F.A.P.A.
109–10 QUEENS BOULEVARD
FOREST HILLS, N. Y. 11375

BOULEVARD 1–5544

Private and Confidential Communication

December 2, 1971

Sidney Leibowitz, M.D.
School Medical Director
Board of Education of the City of New York
65 Court Street
Brooklyn, N.Y.  11201

Re: Francine   Newman

Dear Dr. Leibowitz:

Miss Newman was interviewed twice, namely on 11/18/71 and 11/29/71. The first interview she brought in a union representative and at the second interview she was seen alone. Interestingly, for the second interview she was accompanied by a union representative plus a psychiatrist, both whom she wanted to sit in at the interview, suggesting her expansiveness, aggressivity, and lack of trust. The psychiatrist was Dr. James Shea of 1000 Park Avenue, New York City, not the same psychiatrist she had seen before and whose report is in her file. I felt it to be extremely important to interview her alone as these other people would dilute the interview situation.

She is a 48 year old white unmarried Jewish woman who came on time to each of the interviews. She spoke slowly with a smile being very controlled and controlling. She described her difficulty in the past at one of the schools. As she described the events, it was apparent that she felt justified in all of her behavior which included obvious difficulty "accepting orders". Here she would openly ignore or fight for what she believes is right regardless of whatever the Principal or other supervisor would say. She had no insight that she has a problem with her own narcissism and expansiveness. She showed poor judgment, lack of insight and impulsive behavior which fits with her expansive narcissistic image of herself. This is a character disorder of the passive aggressive personality type. In her interview with me, her glorification of her accomplishments, her expressive, almost theatrical air of superiority, her bringing to her interview a psychiatrist plus the union representative, all verify this impression of mine.

That her private psychiatrist, Dr. Valicenti, found after "lengthy studies through October, 1970, and psychometric testing that there was no indication that Miss Newman was in any way incapacitated by psychological difficulties which require treatment, etc.", does not in any way change my psychiatric impression. Since she predominantly has a character Disorder, her behavior is egosyntonic and as such she does not reveal the usual neurotic anxiety or defenses against anxiety and does not feel the need for therapy. Her behavior pattern is a way of life and her prognosis is poor. I read Dr. Isenberg's report and concur with his impressions. It is very likely that there could be a repetition of similar situations of her antagonism, poor impulse control, and expansiveness were she to be allowed [sic] to resume her teaching. I concur with Dr. Isenberg's diagnosis and his recommendation that Miss Newman's mental status is Passive aggressive Personality, aggressive type, severe and is not fit to perform the duties of a teacher. I would hope that she can enter a psychotherapeutic relationship with the aims of improving her functioning rather than to prove to the therapist that she is a well person, capable of superior functioning.

Sincerely

/s/ Jack Schnee
JACK SCHNEE, M.D.
Panel Psychiatrist

her to Dr. Emanuel Fisher for psychological testing on October 26, 1970.[6]

Dr. Valicenti's conclusion was as follows:

"At the request of Miss Francine Newman, the following psychiatric report is being sent to you. Miss Newman was seen by me in psychiatric consultation in the period from Sept. 8, 1970 thru Oct. 16, 1970.

"Thruout the course of these interviews with Miss Newman, there was no evidence of any neurotic, or psychotic trends, nor any severe degree of personality problems that would interfere in any

**6.** Dr. Fisher's report, dated October 26, 1970, reads as follows:

EMANUEL FISHER, PH.D.
CLINICAL PSYCHOLOGIST
30 FIFTH AVENUE
NEW YORK, N. Y. 10011

CLIENT: Newman, Francine
DATE OF BIRTH: 10/30/23
AGE: 47–0
DATE TESTED: 10/26/70

GRAMERCY 3–5620

WAIS, Rorschach, TAT, Figure Drawing

A cheerful, expensive, outgoing individual, Miss N. was fully cooperative and responsive in the testing.

Miss N. achieved a full-scale IQ of 115: verbal 125, performance 100. Potentially capable of functioning well within the superior range, and even in the very superior range in some areas, a combination of depression, anxiety and self-involvement tends to reduce Miss N's intellectual efficiency. She does best in those areas in which social structure and convention provide the essential guidelines for feeling, thought and behavior. Where, however, individual initiative is required to deal with novel, complex and dynamic situations involving abstraction or interpersonal relations, she performs less competently.

Basically, Miss N emerges as a somewhat egocentric individual who is energetically and expansively involved in and committed to a rather hedonistic style of life. There is no test-evidence of any thought or affect disorder. Apart from the depression and anxiety noted above there is no evidence of any significant neurotic symptomatology. What we do have evidence for is a stable characterological integration of a somewhat narcissistic and hedonistic nature.

Because she is an energetic individual, Miss N is likely to come across to people as aggressive and combative. Actually, this impression grows out of her tendency to be broad and expansive in the expression of mood, thought or impulse. The content of her moods, thoughts and impulses are not at any point hostile or aggressive. At worst, she might be understood to be relatively insensitive to others because of her naive self-involvement. At best, she might be understood to be merely excessively self-assertive.

In her dealings with life and with people, Miss N is motivated by a relatively unsophisticated conventionality. Her definitions of right and wrong, of appropriate goals in life, of the relationship between people generally and the sexes specifically are highly formal, conventional and somewhat romantic and sentimental. She tends to adhere rather rigidly to these notions and to have difficulty in being flexible in adapting her thinking and responses to the shifting nuances of real situations and real relationships. This rigidity together with her characteristic tactlessness adds to the impression of combativeness. There is nothing to indicate that her particular way of perceiving and evaluating situations and relationships is in any way pathological or that she is unable to function alongside of and cooperatively with others. As a matter of fact, the more structured and convention [sic] a situation might be, the more effectively might she be expected to function.

There is no indication that Miss N is in any way incapacitated by psychological difficulties which require treatment. There are, also no test indications that Miss N is in any way incapable of performing any occupational task whatsoever for which she is qualified by training and experience.

way for her to function alongside of and cooperating with others. Psychological testing was performed by Emanuel Fisher, Ph.D of 30 5th Ave., N.Y., N.Y. on 10/26/70. His findings were confirmatory of my above clinical impressions. In brief, that there was no indication that Miss Newman was in any way incapacitated by psychological difficulties which required treatment."

The second psychiatrist consulted by the plaintiff was Dr. James E. Shea, who saw the plaintiff in psychiatric examination on four occasions, three times in November of 1971 and once on February 21, 1972. Dr. Shea's conclusion [7] was as follows:

"In summary, I find no evidence of psychiatric disorder that would in any fashion interfere with her performance as a teacher. She is an extraordinary human being."

The plaintiff submitted the reports of Drs. Valicenti, Shea and Fisher to the Medical Division of the Board of Education in order that the Medical Director of the Medical Division of the Board of Education might take into consideration the reports of the physicians who had examined her over a period of time in reaching a determination as to her competence to resume her professional duties.

Dr. Naomi Poole, Assistant Director of the Medical Division at the Board of Education, read the reports of Drs. Valicenti, Shea and Fisher but did not give them much weight.

The plaintiff made seven requests for the release of medical reports to her or to her physician between August, 1970 and November 8, 1971. The release of the subject medical reports was mandated by Article 4 subdivision (f)(2) of the then existing con-

7. The full text of Dr. Shea's report dated February 25, 1972 reads as follows:

JAMES E. SHEA, M. D.
1000 PARK AVENUE
NEW YORK, NEW YORK 10028

REGENT 7–1177

25 February 1972

Mr. William Goffen
150 Broadway
New York, New York 10038

Dear Mr. Goffen:

This is a report of my psychiatric examination of Francine Newman, which took place on 11/24/71, 11/27/71, 11/29/71 and most recently on 2/21/72.

Miss Newman is a slim woman, neatly dressed and well-groomed. Her behavior is frank and open, completely spontaneous. There is no evasiveness present. Her answers to questions are direct and relevant. There is no circumlocution nor tangential discursiveness. Her thought processes are logical and well organized. I could find present not a shred of paranoid or psychotic thinking.

Her emotions are appropriate and sensitive. This last fact was particularly noteworthy on the examination of February 21st, since her father had died just a week before. Despite this bereavement, she spoke to her hopes for the future in a constructive and ultimately optimistic way.

Miss Newman's basic personality structure is flexible, out-going, friendly and entirely lacking in morbidity. I would think that as a teacher she must be imaginative, lively, stimulating and conscientious.

In summary, I find no evidence of psychiatric disorder that would in any fashion interfere with her performance as a teacher. She is an extraordinary human being.

Yours sincerely,

/s/ James E. Shea, M.D.
JAMES E. SHEA, M.D.

JES/ag

tract between the Board of Education and the United Federation of Teachers.

The only report ever released prior to the institution of the instant Federal action was a conclusory summary of the findings made by the defendant's physicians, dated December 1, 1970 and directed to Dr. Valicenti. The text of the letter purporting to comply with the contract provisions is as follows:

"Dear Dr. Valicenti:

"At the request and with the authorization of Miss Francine Newman, this information concerning her health leave is being sent to you.

"This teacher was examined in the Medical Division February 13, 1970 and by a psychiatric consultant on February 25, 1970. Psychometric testing was carried out on April 13, 1970. The consensus of these examinations was that she had a psycho-neurosis; a passive aggressive personality disorder characterized by poor judgment, lack of insight, explosive and impulsive behavior which impaired her ability to perform her duties.

"She was, therefore, granted a health leave to June 30, 1971, in order that she might seek medical care to improve her health status.

"We trust that this information will be of service to you in assisting her.

> Very truly yours,
> Sidney Leibowitz, M.D.
> Medical Director"

The plaintiff appealed the denial of an *ad hoc* medical review. Her appeal was, on consent of the interested parties, submitted to arbitration and was denied on September 28, 1971.

On March 1, 1972, plaintiff commenced a proceeding in the New York State Supreme Court, Kings County, pursuant to Article 78 of the New York Civil Practice Law and Rules seeking an order "(1) annulling the determination made on July 31, 1970, plac-ing the petitioner on leave of absence from September 11, 1970, through June 30, 1971, (2) annulling the determination made on January 18, 1972, placing the petitioner on leave of absence from September 10, 1971 through June 30, 1972, (3) directing the petitioner's accumulated sick leave be restored to her for the period from September 11, 1970 through June 30, 1971, (4) directing that respondents (Board et al.) attach to their answer all medical reports of the Medical Bureau subsequent to her principal's recommendation that she be given a medical examination, and for other incidental relief."

In a decision dated May 17, 1972, and confirmed by an order signed on July 6, 1972, Mr. Justice Heller denied the plaintiff's petition in part, remanding for a redetermination the "part of the proceeding which deals with the determination made on January 18, 1972 placing her on leave of absence from September 10, 1971 to June 30, 1972 without pay from November 7, 1971." The Court stated that the action of the Board

> "should be supported by an adequate record to establish that there was a reasonable basis for placing the petitioner in the status of an inactive employee without pay from November 7, 1971. The function of this Court is limited to a review of that determination. There should be a remand and upon remand the medical records of petitioner's physicians and the re-examination of petitioner, if conducted, should be considered and a new recommendation made by the Medical Director to the respondent."

On October 10, 1972, the Board requested plaintiff to submit to a medical examination and plaintiff refused to do so.

Plaintiff presently is a licensed tenured teacher on leave of absence without pay.

The Court has set forth above a full statement of the facts as to which there is no dispute but is satisfied that a good portion of the same is not material herein.

As this Court sees it, the sole question for it to determine is whether due process was accorded to the plaintiff when she was placed and thereafter continued on medical leave of absence. This Court is not concerned at this point with the merits of the recommendations of the doctors or other school personnel or of the decision of the School Board.

This due process question is divisible into at least two parts: (1) was plaintiff accorded due process in the period up to the date when she was placed on medical leave, i. e., in the pre-medical leave period, and (2) was the plaintiff accorded due process in the period subsequent to July 31, 1970, i.e., in the post-medical leave period.

If plaintiff was accorded at any time procedures sufficient to satisfy due process in the post-medical leave period and if she refused or failed to avail herself thereof, then she would not be entitled at this juncture to the equitable relief of reinstatement which she seeks and her suit would only be one for back pay and the restoration of her accumulated sick leave based on a purported due process violation up until she was finally accorded due process.

In this regard, on May 17, 1972, the New York State Supreme Court, Kings County (Heller, J.), directed that she be accorded, prior to a redetermination of whether she should be reinstated, a proceeding sufficient

to supply "an adequate record to establish that there was a reasonable basis for placing the petitioner in the status of an inactive employee" and explicit consideration of the medical reports of plaintiff's physicians and of any other reports obtained on a re-examination of the plaintiff. Given this, a new recommendation was to be made by the Medical Director to the School Board.

■ In this Court's opinion, the procedures so prescribed by Mr. Justice Heller in his decision are sufficient to satisfy plaintiff's due process rights in the post-medical leave period,[8] see *Teachers United for Fair Treatment et al. v. Anker*, 445 F.Supp. 469, at 475–476 (E.D.N.Y.1977) (Pratt, J.); *Siletti v. New York City Employees' Retirement System*, 401 F.Supp. 162, 167–68 (S.D.N.Y.1975) (Lasker, J.), *cert. denied*, —— U.S. ——, 98 S.Ct. 109, 54 L.Ed.2d 88 (1977).

In the *Teachers United* case, Judge Pratt indicated that a tenured teacher's right to submit contrary medical reports in a similar leave of absence context satisfied due process. In so deciding Judge Pratt relied on Judge Lasker's decision in the *Siletti* case, which held that in instances involving conflicting findings of medical experts, due process is satisfied by the submission and consideration of the conflicting medical findings; a full scale adversary hearing not being required.[9]

---

**8.** It should be noted that this Court's conclusion that Mr. Justice Heller's prescribed relief accorded plaintiff due process is distinguishable from the erroneous conclusion, previously made in this case, that the State Court decision was *res judicata* of plaintiff's due process claim.

**9.** In reaching this conclusion about plaintiff's due process claim, the Court is mindful of the seemingly contradictory precedent in *Snead v. Department of Social Services, City of New York*, 355 F.Supp. 764 (S.D.N.Y.1973), vacated 416 U.S. 977, 94 S.Ct. 2376, 40 L.Ed.2d 755 (1974), 389 F.Supp. 935 (D.C. 1974), vacated 421 U.S. 982, 95 S.Ct. 1985, 44 L.Ed.2d 474 (1975), 409 F.Supp. 994 (D.C. 1975), vacated 425 U.S. 457, 96 S.Ct. 1630, 48 L.Ed.2d 88. However, the initial panel decision in *Snead*, 355 F.Supp. 764 (S.D.N.Y.1973), was vacated by the Supreme Court in light of *Arnett v.*

*Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), 416 U.S. 977, 94 S.Ct. 2376, 40 L.Ed.2d 755 (1974). While the panel reaffirmed its initial decision on plaintiff's due process claim, 389 F.Supp. 935 (D.C.1975) the Supreme Court never reviewed this determination but instead vacated the reaffirmance on grounds of mootness, 421 U.S. 982, 95 S.Ct. 1985, 44 L.Ed.2d 474 (1975). When the panel rejected the mootness argument and entered judgment for the plaintiff, 409 F.Supp. 994 (D.C. 1975), the Supreme Court finally vacated with instructions to dismiss plaintiff's complaint, suggesting that the panel should never have exercised jurisdiction in the case *ab initio*, 425 U.S. 457, 96 S.Ct. 1630, 48 L.Ed.2d 88. It is this Court's opinion that the Supreme Court's first remand and the final disposition of the case substantially undermines, if not vitiates, the initial panel decision on the merits.

In the instant case, had plaintiff availed herself of the relief prescribed by Mr. Justice Heller, not only would she have had consideration of her doctor's reports, but such consideration would be explicitly contained in the "adequate record" required by the State Court and would presumably be subject to further judicial review.[10] Indeed, the School Board might well have accorded plaintiff a full-scale adversary proceeding so as to create an "adequate record" as required by the State Court.

■ Since the plaintiff refused or failed to avail herself of this relief, it would seem clear that she is not at this point entitled to reinstatement or other equitable relief. Plaintiff is thus left with her claim for back pay and accumulated sick leave. Under *Monell v. Department of Social Services of the City of New York*, 532 F.2d 259 (2d Cir.), *cert. granted*, 429 U.S. 1071, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977), it seems equally clear that plaintiff is not entitled to any such relief under 42 U.S.C. § 1983 and 28 U.S.C. § 1343 from the defendant School Board.

Alternatively, plaintiff claims that she is entitled to such relief under the Fourteenth Amendment of the Constitution and 28 U.S.C. § 1331, apparently under the rationale expressed by the U.S. Supreme Court in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and by the Second Circuit Court of Appeals in *Gentile v. Wallen et al.*, 562 F.2d 193 (2d Cir. 1977).

In the *Gentile* case, the Court of Appeals said "a claimed denial of due process by a school board states a cause of action directly under the Fourteenth Amendment." At 196. The Court of Appeals, however, did not reach the question of whether back pay or other money damages are available under any such claim or whether only equitable relief was appropriate thereunder, at 197, n. 4.

So the question of whether the plaintiff in this case may recover back pay and accumulated sick leave benefits during the period from July 31, 1970 to the date of Mr. Justice Heller's decision in a suit against the School Board directly under the Fourteenth Amendment, if, in fact, her due process rights were violated during that time, has not, to date, been decided by the Court of Appeals for this Circuit, nor has it been decided by the United States Supreme Court.

*Turano v. Board of Education of Island Trees, etc.*, 411 F.Supp. 205, 212 (E.D.N.Y. 1976), was a case involving the allegedly wrongful termination of a probationary teacher. There this Court said that it "has substantial doubts whether plaintiff can maintain an action for money damages under * * * the Fourteenth Amendment". Since this decision, Judge Henry F. Werker has held, in a well reasoned opinion, that such remedy is not afforded by the Fourteenth Amendment. *Santora v. The Civil Service Commission, City of New York et al.*, 443 F.Supp. 25 (S.D.N.Y.1977).

■ Thus for the reasons indicated in Judge Werker's and the undersigned's opinions this Court does not believe that a claim for money damages lies directly under the Fourteenth Amendment and hence plaintiff may not recover on this basis her back pay and accumulated sick leave during the period from July 7, 1970 to the date of Mr. Justice Heller's decision.

Assuming *arguendo* that plaintiff may have a claim for money damages under the Fourteenth Amendment, then the question remains as to whether plaintiff was accorded due process in the pre-medical leave period from January 26, 1970 to July 31, 1970.

In *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Supreme Court indicated that the requirements with respect to a "pre termination"

10. It should also be noted that plaintiff's sick leave having been exhausted, she was also presumably entitled to a review by an *ad hoc* committee of physicians, as authorized by contract, of any redetermination of the medical board.

proceeding were far less than those in a "post termination" proceeding.

 In this Court's view, the same should be true with respect to the pre-medical leave of absence proceeding which was accorded to the plaintiff in this case. Here the plaintiff concededly could have submitted, but did not at first, medical and/or psychiatric reports from her own doctors and psychiatrists attesting to her good physical and mental health to the Medical Director and to the School Board. This opportunity, of which plaintiff did not initially avail herself, would in this Court's view be sufficient to satisfy pre-medical leave due process requirement. *See Teachers United, supra; Siletti, supra.* To require more of the School Board in the pre-medical leave period would unduly hinder defendant's justifiable need to quickly remove teachers whose medical unfitness renders them unable to teach and perhaps even poses serious harm to its students.

Plaintiff's repeated assertion that any such medical or psychiatric reports would be given little or no weight by the Medical Director and the School Board does not alter this conclusion. Petitioner may have an argument that Mr. Justice Heller was wrong in denying plaintiff's motion to annul the determination made on June 31, 1970, placing the petitioner on inactive status and medical leave of absence, but that is a question which has already been determined adversely to the plaintiff by the New York courts and no appeal from such adverse decisions on the merits may be considered here. The question for this Court, however, is: Did the available procedures satisfy due process in the pre-medical leave period? We hold that they did.

Finally, it should be noted that there is no claim or basis for a claim that any "liberty" interest of the plaintiff has been violated without due process of law. As in *Lombard v. Board of Education,* 440 F.Supp. 577 (E.D.N.Y.1977), there has been no proof of publication of the findings of defendant's medical doctors, psychiatrists and psychologists to others than those with a need to know. The conclusion of medical unfitness to teach could, insofar as potential employers and the public are concerned (apart from what they may have learned by reason of plaintiff's lawsuits), be wholly unrelated to any psychiatric problem which plaintiff may or may not have. *See Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); *Gentile, supra,* at 197.

From the foregoing it is clear that defendant's motion for summary judgment must be, and the same hereby is, granted and plaintiff's cross-motion for summary judgment must be, and the same hereby is, denied.

SO ORDERED.